IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PEYTON KOCEVAR, | CASE NO. 3:24-CV-00876-JRA |
| Petitioner, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN MICHAEL SCHWARTZ, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

### INTRODUCTION

Representing himself, Petitioner Peyton Kocevar, a prisoner in state custody, seeks a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). The District Court has jurisdiction under § 2254(a) and the matter is referred to me to prepare a Report and Recommendation. (Non-document entry of June 7, 2024). Respondent Warden Michael Schwartz, as Warden of the Toledo Correctional Institution (hereinafter, the State), filed the Return of Writ with the state court record. (ECF #6). Mr. Kocevar did not file a Traverse.

Mr. Kocevar asserts three grounds for relief, all arising from his convictions for various sex offenses at two trials. For the reasons below, I recommend the District Court **DENY** Grounds One and Three on the merits, **DISMISS** Ground Two as not cognizable, and **DISMISS** the petition. I further recommend the District Court **DENY** Mr. Kocevar a certificate of appealability (COA) on all grounds.

1

P<small>ROCEDURAL</small> H<small>ISTORY</small>

**A.    State court factual findings**

The Ohio Court of Appeals, Second Appellate District, set forth the facts here. These factual findings are presumed correct unless Mr. Kocevar rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Second District determined:

> {¶5} On June 26, 2020, an indictment was filed charging Kocevar with seven counts of rape, first-degree felonies, and two counts of gross sexual imposition (by force), fourth-degree felonies. Five rape charges were alleged to have been by force or threat of force, two were alleged to have involved a substantially impaired victim, and the nine total charges involved six alleged victims. The listed dates of the offenses were various dates in 2012, 2013, 2014, and 2016, when Kocevar was a minor and was in high school. . . .

> {¶6} On September 24, 2020, Kocevar filed a motion for a bill of particulars, which the State provided on October 6, 2020. This revealed that the alleged victims were as follows: Count One, rape by force or threat of force of K.K., on October 18, 2014; Count Two, rape by force or threat of force of R.O. between January 1, 2016 and December 31, 2016; Count Three, rape involving a substantially impaired victim, R.O., between January 1, 2016 and December 31, 2016; Count Four, rape by force or threat of force of M.M. between January 1, 2013 and December 31, 2014; Count Five, rape by force or threat of force of A.H. between January 1, 2013 and December 31, 2014; Count Six, gross sexual imposition involving A.H. between January 1, 2013 and December 31, 2014; Count Seven, rape by force or threat of force of J.T. between April 1, 2014 and April 30, 2014; Count Eight, rape involving a substantially impaired victim, M.C., between December 31, 2012 and January 1, 2013; and Count Nine, gross sexual imposition involving M.C., between December 31, 2012 and January 1, 2013.

>            * * *

> {¶11} The case was initially tried to a jury on November 29 and 30 and Dec. 1-3, 2021. After deliberating, the jury found Kocevar guilty of the rape charge concerning J.T. and not guilty of the rape and gross sexual imposition charges involving M.C., the rape charge involving M.M., and the two rape charges involving R.O. The jury was unable to reach a verdict on the rape charge involving K.K. and the rape and gross sexual imposition charges involving A.H. The court, therefore, declared a mistrial with respect to the latter three charges. A new jury trial on the remaining charges was scheduled to begin on April 27, 2022.

2

{¶12} Before that trial, Kocevar filed another motion asking the court to sever the remaining counts. However, the court denied the motion on April 11, 2022, finding that the case was simple and direct, based on the jury's mixed verdicts. After the second trial, the jury found Kocevar guilty of the remaining three charges (rape as to K.K., and rape and gross sexual imposition as to A.H.). The trial court then sentenced Kocevar to a total of 11 years in prison and ordered that he be subject to registration as a Tier III sex offender.

(ECF #6-1 at PageID 468-71 (citations omitted); *see also State v. Kocevar*, 213 N.E.3d 1240, 1246-48

(Ohio Ct. App.), *appeal not allowed*, 215 N.E.3d 565 (Ohio 2023) (table)).

## B.    Direct appeal

Through counsel, Mr. Kocevar timely appealed his convictions to the Second District.

(ECF #6-1 at PageID 383). There, he raised four assignments of error:

1.    The trial court erred in denying severance of the charges by finding the evidence was simple and direct, resulting in prejudice to Kocevar when convicted upon retrial of the indictment;

2.    The trial court erred in denying Kocevar's motion to dismiss by finding that the state's delay in prosecution was justifiable, resulting in Kocevar suffering prejudice, thereby warring reversal of the convictions;

3.    The trial court erred in sentencing Kocevar as an adult, giving him a mandatory term of incarceration, violated his right to equal protection, and the principles against imposition of cruel and unusual punishment; and

4.    As a result of the cumulative errors, Kocevar requests that the conviction be reversed and remanded.

(*See id.* at PageID 390-91) (cleaned up). On May 5, 2023, the Second District affirmed. (*See id.* at

PageID 466, 513).

On June 20, 2023, through new counsel, Mr. Kocevar timely appealed to the Supreme

Court of Ohio. (*Id.* at PageID 518-20). There, he advanced three propositions of law:

1.    A trial court's refusal to sever the counts relating to multiple accusers and different alleged sexual assaults that occurred on separate occasions irreparably prejudices a defendant's constitutional right to a fair trial;

2.  When allegations of sexual assault involving a minor are disclosed to individuals who are statutorily designated as mandatory reporters who fail to undertake any measures to investigate, report and/or prosecute said offenses, the delay cannot be excused as justifiable so as to avoid dismissing the charges; and

3.  A defendant's constitutional rights to due process as well as the protections against disparate treatment and cruel and unusual punishment are violated when they are subjected to a different and more severe punishment simply because of an unjustified delay in instituting criminal charges.

(*Id.* at PageID 522). On August 29, 2023, the Supreme Court of Ohio declined to hear his appeal.

(*Id.* at PageID 559; *see also Kocevar*, 215 N.E.3d 565).

FEDERAL HABEAS PETITION

Before this Court, Mr. Kocevar raises three grounds for relief:

**GROUND ONE:** Petitioner is subjected to cruel and unusual punishment by way of being tried, convicted, and sentenced as an adult, without substantive due process.

**Supporting facts:** The State of Ohio has admitted that the Petitioner was a minor at the time of the alleged offenses. However, the State proceeded to treat the Petitioner as an adult, conducting a trial, obtaining a conviction, and imposing a sentence accordingly. In doing so, the State of Ohio has disregarded the fundamental principle that children possess a different level of moral and legal culpability compared to adults. The State has chosen to completely overlook the fact that the Petitioner was still a child when he purportedly committed the crimes for which he has been convicted. This blatant disregard for the constitutional distinction between adults and children is deeply concerning and highlights a failure to uphold the unique rights and protections owed to juveniles in the justice system.

**GROUND TWO:** The trial court erred in denying severance of the charges.

**Supporting facts:** Due to the complex and intricate nature of the charges, it was necessary to conduct separate trials for each victim. However, the decision not to [sever] proved to be prejudicial for the Petitioner, as the State consolidated the identities of the alleged victims. Consequently, the jury faced difficulty in distinguishing and deliberating on each count individually, resulting in confusion and a unanimous guilty verdict on all counts upon retrial.

**GROUND THREE:** Petitioner's indictment was unjustifiably delayed, causing actual and irreparable prejudice to Petitioner's defense.

4

**Supporting facts:** The State of Ohio acknowledged that the alleged crimes took place from 2014 to 2015. However, the Petitioner was not formally charged until June 2020, a considerable time after the incidents purportedly occurred. Information and evidence demonstrate that the Petitioner's late father, Chad Kocevar, was present during one or more of the alleged offenses and could have provided crucial testimony that would have discredited the credibility of the prosecution's witnesses. Had the Petitioner not been unfairly delayed in being charged, he would have been able to present a strong defense against the unfounded, baseless, and scandalous accusations.

(ECF #1 at PageID 5, 7-8) (cleaned up).

STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Kocevar's habeas petition. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" so AEDPA acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Habeas courts review the last-explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).

Accordingly, habeas relief cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

For the purposes of § 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court's decision is "contrary" to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Id.* at 405. The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Id.* A state court does not act contrary to Supreme Court precedent when the precedent of the Supreme Court is ambiguous or nonexistent. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court's decision involves an "unreasonable application" of Supreme Court precedent if (1) the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the state prisoner's case or (2) the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. A state-court decision must be "objectively unreasonable" to have unreasonably applied Supreme Court precedent which requires more than the decision being "erroneous" or "incorrect." *See id*. at 409-11. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

6

Under § 2254(d)(2), a state court's factual determinations stand unless they too are objectively unreasonable in light of the evidence presented in state court. *See Harrington*, 562 U.S. at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18. Under AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct" unless the petitioner offers clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2554(e)(1).

Comity principles also require federal courts to defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including the statute of limitations, exhaustion of state remedies and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *See Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal habeas review is limited to federal claims that a state court decided on the merits. Claims that were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not reviewable by a federal habeas court. *See Bonnell v. Mitchel*, 301 F.Supp.2d 698, 722 (N.D. Ohio Feb. 4, 2004).

**State-law claims not cognizable on federal habeas review**. Federal habeas review is available only for claims that "challenge the legality of [the petitioner's] custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Put another way, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F.App'x 575, 582 (6th Cir. 2010); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (quotation omitted); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted).

Federal habeas review is generally not available to decide whether a state court complied with state law or state procedural requirements. *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). A federal habeas court "does not function as another state appellate court to review a state court's interpretation of its own law or procedure." *Id.* Instead, a federal habeas court is bound by "[a] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

A petitioner cannot justify habeas relief simply by asserting that a state-law error violates the federal constitution. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). But habeas relief may be available if an error of state law made the criminal process "fundamentally unfair." *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). The habeas petitioner must show "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Id.*

**Procedural default.** A federal habeas court may not review claims that have been procedurally defaulted under state law. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). There are two avenues by which a petitioner may procedurally default a claim. *Williams*, 460 F.3d at 806. One way a procedural default occurs is if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* To determine whether that failure bars review of a habeas claim, courts in the Sixth Circuit ask four questions: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to meet that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an

9

adequate and independent state ground on which the state can bar review of the federal constitutional claim; and (4) whether the petitioner can show cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The other way a claim can be procedurally defaulted is if a petitioner does not raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). To have a habeas claim considered on the merits, a petitioner must present that federal claim at "each and every level" of the state courts. *See Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003). If a petitioner did not first raise his federal habeas claim before the state courts and state law would no longer allow the petitioner to raise the claim in state court, the claim is procedurally defaulted. *Williams*, 460 F.3d at 806.

**Excusing procedural default.** A procedural default is not the end of a habeas claim. A petitioner can overcome a procedural bar by showing either (1) cause for the default and actual prejudice because of the alleged violation of federal law or (2) not considering the claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 749. Success here does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim (subject to the standard of review above) when the claim would otherwise be procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *see also Coleman*, 501 U.S. at 750.

Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded

10

counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Neither a petitioner's pro se status nor any ignorance of the law and procedural filing requirements are enough to show cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

To show prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice. *Murray*, 477 U.S. at 494. Rather, the petitioner must show the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Id*. There is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *Ambrose v. Booker*, 801 F.3d 567, 577-78 (6th Cir. 2015).

**Actual innocence exception.** Alternatively, a petitioner may overcome procedural bar through a convincing claim of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). By such a showing, a petitioner can overcome the end of the statute of limitations, *see id.*, and a procedural default. *See Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). As the Sixth Circuit recently summarized,

> This means that a petitioner may not pass through the equitable gateway by simply undermining the state's case. Rather, he must demonstrate that he *factually* did not commit the crime. Of course, dismantling the state's case is *relevant* and *helpful* to the petitioner because it leaves a vacuum to be filled by an exonerative explanation; but it is not sufficient in and of itself.

*Hubbard v. Rewerts*, 98 F.4th 736, 743 (6th Cir. 2024) (emphasis in original), *cert. denied*, 145 S.Ct. 1201 (2025). A valid actual innocence claim must be supported by new, reliable evidence that was not presented at trial and is "so strong a court cannot have confidence in the outcome of the

11

petitioner's trial." *Schlup*, 513 U.S. at 324. Such evidence can include exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. *Id.* But this evidence must show that, "more likely than not[,] any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

**ANALYSIS**

The State argues Grounds One and Two both raise issues of state law and thus are not cognizable in federal habeas review. (ECF #6 at PageID 41-42, 50-51). The State also argues Ground Two is procedurally defaulted under Ohio's contemporaneous-objection rule. (*Id.* at PageID 63, 72-73). The State further argues the Second District reasonably rejected Ground Three. (*Id.* at PageID 77-79). No Traverse has been filed and so Mr. Kocevar has not responded to the State's arguments. For organizational clarity, I proceed ground by ground.

**A.      I construe Ground One to raise a cognizable federal constitutional claim, but I conclude it lacks merit.**

   **1.      Ground One presents the same federal constitutional claim the Second District decided on its merits.**

In Ground One, Mr. Kocevar argues he was "subjected to cruel and unusual punishment by way of being tried, convicted, and sentenced, as an adult, without substantive due process." (ECF #1 at PageID 5). The State argues Ground One raises only a state-law claim because it involves the application of state law and the exercise of the state court's discretion. (ECF #6 at PageID 41-42). I disagree.

Ground One invokes both an Eighth Amendment cruel-and-unusual-punishment claim and a Fourteenth Amendment substantive-due-process claim. (*See* ECF #1 at PageID 5) ("Petitioner is subjected *to cruel and unusual punishment* by way of being tried, convicted, and sentenced as an adult, *without substantive due process*.") (emphasis added). Mr. Kocevar indicated he raised this claim

12

in his direct appeal. (ECF #1 at PageID 6). His appellate brief discusses a similar federal constitutional claim. (*Compare* ECF #1 at PageID 5 *with* ECF #6-1 at PageID 425-34). And the Second District ruled on the merits of that federal claim. (*See* ECF #6-1 at PageID 499-512; *Kocevar*, 213 N.E.3d at 1261-68). I thus construe Ground One to raise the same Eighth Amendment and substantive-due-process claims Mr. Kocevar raised in state court.

The Second District also considered a claim that Ohio's statutory scheme allowing a juvenile who commits what would be a felony if committed by an adult and who is not taken into custody until after the juvenile turns 21 was an unconstitutional ex-post-facto law. (*See* ECF #6-1 at PageID 502-04, 512; *Kocevar*, 213 N.E.3d at 1263-64, 1268). Mr. Kocevar does not mention this claim in his petition and so I do not construe Ground One to include it.

### 2.    The Second District reasonably rejected Ground One.

The Second District ruled on the constitutional claims in Ground One as follows:

#### 1. Equal Protection

{¶99} "The Fourteenth Amendment to the United States Constitution provides that '[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws.' The Equal Protection Clause prevents states from treating people differently under its laws on an arbitrary basis." "'Whether any such differing treatment is to be deemed arbitrary depends on whether or not it reflects an appropriate differentiating classification among those affected; the clause has never been thought to require equal treatment of all persons despite differing circumstances.'"

{¶100} "Under the Equal Protection Clause, a legislative distinction need only be created in such a manner as to bear a rational relationship to a legitimate state interest." "These distinctions are invalidated only where 'they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them.'" "This rational basis analysis is discarded for a higher level of scrutiny only where the challenged statute involves a suspect class or a fundamental constitutional right."

{¶101} Kocevar has not supplied authority indicating juveniles are a suspect class. In fact, he indicates they are not treated as such. However, Kocevar does contend

(without citing authority) that he should be treated as part of a suspect class because he is a former juvenile who was later subjected to common pleas court jurisdiction. We disagree, having found no legal authority to support such a claim. In reality, many juveniles are subjected to trial as adults. Therefore, heightened scrutiny would not apply.

## 2. Cruel and Unusual Punishment

{¶102} "The Eighth Amendment to the United States Constitution states: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' A key component of the Constitution's prohibition against cruel and unusual punishment is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" "'To constitute cruel and unusual punishment, "the penalty must be so greatly disproportionate to the offense as to shock the sense of justice of the community.'"

{¶103} Even in *Anderson*, which involved a juvenile who was bound over and tried as an adult while still a juvenile, the court held that an aggregate 19-year sentence did not "constitute cruel and unusual punishment because there is no national consensus against mandatory sentencing for juveniles, the sentence is proportional to the crimes he committed, and it is not one of the harshest possible penalties for juvenile offenders tried as adults." In that case, the defendant was 16 years old and was convicted of three counts of aggravated robbery, firearm specifications attached to those felonies, and one count of kidnapping with a firearm specification. He was originally sentenced to 28 years in prison (including consecutive sentences). After the sentence was reversed, the trial court resentenced the defendant to a total of 19 years in prison, with the 11-year terms on each robbery conviction to run concurrently with each other and consecutive to the eight-year prison term for the kidnapping and its firearm specification.

* * *

{¶108} Bearing all the above principles in mind, we will consider Kocevar's arguments.

## B. Discussion

{¶109} As a preliminary point, we note that R.C. 2152.02 has been amended since Kocevar's offenses were committed, but the definition of "child" has not been substantively changed in any way. Under R.C. 2152.02(C)(1), a "child" is defined as "a person who is under eighteen years of age," with certain exceptions that are listed in subdivision (C). As relevant here, subdivision (C) states that:

(2) *Subject to division (C)(3) of this section*, any person who violates a federal or state law or a municipal ordinance prior to attaining eighteen years of age shall be deemed a "child" irrespective of that

person's age at the time the complaint with respect to that violation is filed or the hearing on the complaint is held.

(3) Any person who, while under eighteen years of age, commits an act that would be a felony if committed by an adult and who is not taken into custody or apprehended for that act until after the person attains twenty-one years of age *is not a child in relation to that act.*

(Emphasis added.)

{¶110} Similarly, R.C. 2151.23 has been amended a number of times since Kocevar's offenses occurred. However, there have been no changes in the relevant part of the statute. *Compare* current R.C. 2151.23(I) with the version that became effective on September 30, 2011, pursuant to Am.Sub.H.B. 86, 2011 Ohio Laws 29. As relevant here, R.C. 2151.23(I) provides that:

> If a person under eighteen years of age allegedly commits an act that would be a felony if committed by an adult and if the person is not taken into custody or apprehended for that act until after the person attains twenty-one years of age, the juvenile court does not have jurisdiction to hear or determine any portion of the case charging the person with committing that act. In those circumstances, divisions (A) and (B) of section 2152.12 of the Revised Code do not apply regarding the act, and the case charging the person with committing the act shall be a criminal prosecution commenced and heard in the appropriate court having jurisdiction of the offense as if the person had been eighteen years of age or older when the person committed the act. All proceedings pertaining to the act shall be within the jurisdiction of the court having jurisdiction of the offense, and that court has all the authority and duties in the case that it has in other criminal cases in that court.

{¶111} R.C. 2152.12(J), which deals with procedures for transfers of juvenile cases, contains the same language as R.C. 2151.23(I). Again, while R.C. 2152.12 was also amended a number of times after Kocevar's alleged crimes, the current version is unchanged from the one in place at the time of the crimes. *Compare* current R.C. 2152.12(J) with the version in effect on September 11, 2011, pursuant to Am.Sub.H.B. 86, 2011 Ohio Laws 29.

{¶112} The Supreme Court of Ohio has held that "R.C. 2151.23(I) effectively removes 'anyone over 21 years of age from juvenile-court jurisdiction, regardless of the date on which the person allegedly committed the offense.'" "The three requirements that must be present to divest the juvenile court of jurisdiction are: '(1) the defendant must have been under eighteen years of age at the time of the offense; (2) the alleged offense would be a felony if committed by an adult; and (3) the

15

defendant must *not* have been "taken into custody or apprehended" for the offense prior to turning twenty-one years of age.'"

{¶113} All the listed factors are present here, and the juvenile court could not have possibly exercised jurisdiction over Kocevar when the indictment was filed in June 2020, since Kocevar was 22 years old at that time. Instead, Kocevar was subject to prosecution in adult court, with the attendant penalties, including the mandatory minimum prison requirements that can be imposed on adult person.

{¶114} Understandably, Kocevar contends that this is inappropriate and that he should receive lesser penalties because he was a juvenile when he committed the offenses. However, that is not the law. Moreover, while Kocevar argues that transfer to adult court was discretionary in his situation, discretion means just that. If complaints had been filed in juvenile court when Kocevar was a minor, the court may have elected to transfer him to adult court. Kocevar would, therefore, be in the same situation he is now, with adult penalties.

{¶115} This point was made in *Walls*, which rejected a defendant's claim that 1997 changes to R.C. Chap. 2151 were substantive and impaired his vested rights to juvenile court proceedings. The claim was based on "the 'extraordinary' difference between delinquency proceedings in juvenile court and criminal proceedings in common pleas court." Notably, the court remarked that:

> Although the 1997 amendments to the juvenile statutes allowed criminal prosecution without the bindover proceeding required under the 1985 law, we cannot characterize this change as anything other than remedial. Even under the law in effect in 1985, Walls was subject to criminal prosecution in the general division of a court of common pleas if the juvenile court made certain determinations specified by statute. *See* former R.C. 2151.26(A) and (E), 140 Ohio Laws, Part I, 585-586. Thus, under either the 1985 law or the 1997 law, *Walls was on notice that the offense he allegedly committed could subject him to criminal prosecution as an adult in the general division of the court of common pleas.*

{¶116} Likewise, Kocevar would have had notice before his crimes were committed that he could be subject to prosecution in adult court. Furthermore, the arguments Kocevar is making have been previously rejected, no matter how those claims may be clothed, *i.e.*, as violations of due process and equal protection or as prohibitions against cruel and unusual punishment and ex post facto laws.

{¶117} For example, in *State v. Warren*, the Supreme Court of Ohio held that due process is not "violated when the defendant receives a mandatory term of life imprisonment for forcible rape of a victim under age 13 when the defendant was 15 years of age at the time of the offense but not prosecuted until he had passed the age

16

of 21." The defendant in *Warren* was 31 years old when the rape charges were filed in 2004. When the offenses occurred, 1988 laws were in effect.

{¶118} The defendant's due process claim was that "R.C. 2907.02 and R.C. 2151.02(C)(3) * * * were unconstitutionally applied to appellant, who was a minor at the time of the alleged crime; thus appellant's right to due process and a fair trial was denied when he was sentenced as an adult for crimes alleged to have been committed when he was only fifteen years old."

{¶119} Notably, the content of the statutes in question (R.C. 2152.02(C)(3), R.C. 2151.23(I), and 2152.12(J), as here) contained the same wording in 2004 as in 1988 concerning when an individual is no longer considered a "child" and when juvenile courts lose jurisdiction. In addition, in 1988, R.C. 2907.02(B) mandated life sentences for the rapes, and the trial court had no discretion to impose lesser sentences.

{¶120} In *Warren*, the court acknowledged that "'[a] juvenile typically lacks sufficient maturity and good judgment to make good decisions consistently and [to] sufficiently foresee the consequences of his actions.'" Nonetheless, the court found that its prior decision in *Walls* "so essentially undermines Warren's position that he cannot prevail on his claim that his mandatory life sentence violates due process principles of fundamental fairness." The court admitted that *Walls* was not precisely on point but found that "the similarities between the situation in this case and in *Walls* are substantial, and the essential principles that emerge from *Walls* make it impossible for Warren to prevail on his due process argument."

{¶121} Like *Walls*, the court stressed in *Warren* that the defendant was put on notice that he could be prosecuted as an adult. *Id.* And, relevant to the case before us, the court stated that:

> Warren does not explicitly argue that he was prejudiced by the absence of a bindover hearing or that the juvenile court should have retained jurisdiction over his case. Instead, he claims to have been prejudiced by the trial court's inability to consider his age at the time of the offenses in sentencing him for rape. Warren argues that he would have received more favorable treatment if he had been charged with rape while still a juvenile and that that favorable treatment should extend to the rape conviction in this case. Those arguments are significantly undercut by *Walls*, in which this court held that no substantive rights are affected in this situation.

{¶122} In addition, *Warren* rejected the defendant's equal protection argument, which was that his sentence was unfair by being disproportionate to "similarly situated" individuals who were charged while they were still juveniles and were not bound over to adult court. Again finding *Walls* dispositive, the court said that

"'Warren's vested rights were not impaired because under the juvenile statutes in effect when he committed his offenses, he was always subject to criminal prosecution as an adult. * * * Warren is not 'similarly situated' to a juvenile who is charged with rape and not bound over for a trial; therefore, his sentence need not be proportionate to a sentence received by such an offender."

{¶123} Three justices concurred in the judgment only, because they were troubled by the fact that "[t]he current version of R.C. 2907.02(B), which became effective January 1, 2008, does take youth into consideration for some rape offenses * * * ." However, the justices concluded they were bound to affirm the lower court, since former R.C. 2907.02(B), which applied to the defendant, "specified a mandatory life sentence and did not allow for the consideration of a defendant's age." However, none of these points is relevant here. Consistent with *Warren*, the equal protection argument fails because Kocevar is not similarly situated to defendants who are still within juvenile court jurisdiction.

{¶124} Concerning cruel and unusual punishment, Kocevar mentions it but does not make a specific argument about it or cite any cases to support his position. In certain situations, punishments for juveniles who have been tried as adults have been found to be unconstitutional as cruel and unusual punishment.

{¶125} "A punishment does not violate the constitutional prohibition against cruel and unusual punishments, if it be not so greatly disproportionate to the offense as to shock the sense of justice of the community." Imposing a total of 11 years for three rape convictions (involving three different victims) and a gross sexual imposition conviction for one of those victims does not shock one's sense of justice. *Compare State v. Wiesenborn*, 2019-Ohio-4487, 135 N.E.3d 812, ¶ 7, 9, 11-12 and 24-51 (2d Dist.) (rejecting an Eighth Amendment claim where defendant was sentenced to a total of 78.5 years in prison for rapes committed both while as a juvenile and when he was 19 and a senior in high school).

{¶126} In *Wiesenborn*, the defendant was bound over from juvenile court and was sentenced for both juvenile and adult convictions. *Id. See also State v. Strowder*, 2019-Ohio-4573, 147 N.E.3d 1253, ¶ 3 and 14 (8th Dist.) (sentence for 17-year old defendant who was bound over for various crimes including rape, was not cruel and unusual punishment because defendant "will be eligible at age 61 in relation to" these offenses and another offense in a different case); *State v. Watkins*, 2018-Ohio-5137, 126 N.E.3d 381, ¶ 4 (10th Dist.) (defendant who was bound over for various non-homicidal offenses committed at age 16 was not subjected to cruel and unusual punishment by being sentenced to 67 years in prison because defendant would be eligible for judicial release at age 50).

{¶127} The point here is that Kocevar's sentence could have been much worse. However, as noted, the reality also is that Kocevar's status never changed due to any alterations in the law.

{¶128} We also note that in sentencing Kocevar, the trial judge expressly stated that she had considered his youth in deciding the sentence. The court noted that statutory grounds for imposing consecutive sentences were met and that the sentencing range could be a minimum of three years to a maximum of 34.5 years. However, in light of Kocevar's youth at the time of the offenses, the judge elected not to impose consecutive sentences. The judge imposed concurrent 11-year sentences on the three rape counts and a one-year concurrent sentence for the gross sexual imposition charge, for a total sentence of 11 years. As a result, contrary to Kocevar's belief, the trial court did consider his youth at the time of the offenses, and he received the benefit of that consideration.

\* \* \*

{¶130} Based on the preceding discussion, the third assignment of error is overruled.

(ECF #6-1 at PageID 500-02, 504-12; *see also Kocevar*, 213 N.E.3d at 1261-63, 1264-68) (citations and footnote omitted).

As noted earlier, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Cone*, 543 U.S. at 455 (citation and quotation omitted). Accordingly, Mr. Kocevar must demonstrate the Second District's adjudication of his equal-protection and cruel-and-unusual-punishment claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

The Second District's decision on Ground One was not contrary to clearly established federal law. In denying Mr. Kocevar's equal-protection and due-process claims, the Second District relied primarily on *State v. Warren*, 887 N.E.2d 1145 (Ohio 2008), to conclude Mr. Kocevar, as an adult, was not similarly situated to juveniles and had notice he could be tried as an adult. (ECF #6-1 at PageID 507-10). The Supreme Court of Ohio's reasoning in *Warren* was upheld on

federal habeas review. *See Warren v. Smith*, No. 1:09-cv-1064, 2010 WL 2837001, at *16-18 (N.D. Ohio Apr. 29, 2010), *report and recommendation adopted*, 2010 WL 2837002 (N.D. Ohio July 19, 2010). Mr. Kocevar does not point to any intervening Supreme Court precedent that would suggest a different outcome here and I have not found any.

As to Mr. Kocevar's cruel-and-unusual-punishment claim, the Second District noted the limited Supreme Court precedent prohibiting certain sentences for juveniles tried as adults. (*See* ECF #6-1 at PageID 510). In those cases, the Supreme Court prohibited the death penalty for juveniles, *see Roper v. Simmons*, 543 U.S. 551 (2005), and life-without-parole sentences for juveniles convicted of non-homicide offenses, *see Graham v. Florida*, 560 U.S. 48 (2010). But those cases do not apply to Mr. Kocevar because he received an 11-year aggregate sentence (*see* ECF #6-1 at PageID 379), not the death penalty or life without parole. There is no Supreme Court precedent for an adult sentenced to a non-life term of imprisonment for offenses committed as a juvenile. *See Bunch v. Smith*, 685 F.3d 546, 550 (6th Cir. 2012) (noting no Supreme Court precedent clearly established "that consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole"); *Warren*, 2010 WL 2837001, at *20 ("there is no clearly established United States Supreme Court precedent regarding life sentences for crimes committed as a juvenile, but convicted and sentenced as an adult").

Because there is no on-point Supreme Court precedent, the Second District's decision on this issue could not be contrary to clearly established federal law. *Esparza*, 540 U.S. at 17. Federal habeas courts have upheld far longer sentences in similar situations. *See, e.g., Bunch*, 685 F.3d 546 (89 years' imprisonment); *Atkins v. Crowell*, 945 F.3d 476, 478 (6th Cir. 2019) (51 years); *Vinson v.*

*Erdos*, No. 1:22-cv-00657, 2024 WL 3678787, at *13 (N.D. Ohio June 7, 2024) (99 years), *report and recommendation adopted,* 2024 WL 3675820 (N.D. Ohio Aug. 6, 2024).

I thus recommend the District Court **DENY** Ground One as without merit.

**B.    Ground Two is not a cognizable federal constitutional claim; even if it were cognizable, it is procedurally defaulted.**

In Ground Two, Mr. Kocevar argues he was prejudiced by the trial court's denial of his motion to sever each of the charges. (ECF #1 at PageID 7). The State argues Ground Two is not cognizable in federal habeas review because severance is an issue of state law and Ground Two is also procedurally defaulted under Ohio's contemporaneous-objection rule because Mr. Kocevar did not renew his objection to joinder at trial. (ECF #6 at PageID 50-51, 63-64).

**1.    Whether Mr. Kocevar's charges should have been tried separately is a matter of state law not cognizable in federal habeas review.**

Federal habeas review is available only for claims that "challenge the legality of [the petitioner's] custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). As discussed above, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith*, 371 F.App'x at 582. Whether a state trial court erroneously denied a motion to sever trial of criminal counts is a matter of state law. *See Hutchinson v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002); *Clipps v. McConahay*, 705 F.Supp.3d 853, 861 (N.D. Ohio 2023). Improper joinder "violates the federal Constitution if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Collins v. Green*, 838 F.App'x 161, 168 (6th Cir. 2020).

Mr. Kocevar argues he was prejudiced because "the State consolidated the identities of the alleged victims" such that "the jury faced difficulty in distinguishing and deliberating on each count individually, resulting in confusion and a unanimous guilty verdict on all counts upon

retrial." (ECF #1 at PageID 7). But the state courts already rejected the argument that the jurors were confused by the evidence in the first trial and the retrial:

> {¶25} In denying Kocevar's motion to sever, the trial court found before the first trial that the evidence was simple and direct. This was based on the court's consideration of the bill of particulars and the evidence presented at the hearing on the motion to sever. The defense renewed the motion to sever on the record at the first trial, and the court again denied it.
>
> {¶26} As indicated, the first trial resulted in conviction on one rape count (J.T.), not guilty findings on five counts, and a hung jury with respect to two rape counts (A.H. and K.K.) and one count of gross sexual imposition (A.H.). Consequently, the second jury trial involved only two victims and three sexual assault charges.
>
> {¶27} Before the second trial, Kocevar again filed a motion seeking to sever the trial of the offenses related to the two remaining victims. The trial court denied this motion for the same reasons it had previously expressed. The court added that, given the reduction of witnesses and counts for the second trial, "the evidence will be even easier for the jury to follow."
>
> {¶28} Having reviewed the record, we agree with the trial court and find no error, let alone plain error. The first trial involved six victims and nine alleged sexual offenses, but the evidence concerning each alleged victim was not complicated, nor was it difficult to understand. The jury was able to separate the evidence and acquit Kocevar of the rapes of three victims and to find him guilty of only the rape of one victim. During the second trial, the jury found Kocevar guilty of the three remaining charges involving K.K. and A.H.

(ECF #6-1 at PageID 475-76; *see also Kocevar*, 213 N.E.3d at 1250).

AEDPA presumes a state court's factual determinations are correct unless Mr. Kocevar rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Mr. Kocevar offers no facts to show the Second District's review of the record was incorrect so its determination that he was not prejudiced by joinder must stand. And because Mr. Kocevar was not prejudiced, any misjoinder does not rise to a federal constitutional violation. I thus recommend the District Court **DISMISS** Ground Two as not cognizable.

### 2. Ground Two is procedurally defaulted under Ohio's contemporaneous-objection rule.

The State argues alternatively that Ground Two is procedurally defaulted under Ohio's contemporaneous-objection rule because he did not renew his objection to joinder either at the end of the State's case or the close of evidence. (*See* ECF #6 at PageID 63-64).

A petitioner can procedurally default a claim if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Williams*, 460 F.3d at 806. There is a four-pronged analysis to determine whether a state procedural rule bars review of his habeas claims: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner disregarded that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can show cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin*, 785 F.2d at 138.

All four factors indicate Mr. Kocevar procedurally defaulted Ground Two. First, Ohio employs a contemporaneous-objection rule that prohibits the later review of a claim when no objection was made during trial proceedings absent a showing of cause and prejudice. *See State v. Murphy*, 747 N.E.2d 765, 788-89 (Ohio 2001). To preserve a misjoinder claim for appeal and later habeas review, a defendant must renew his motion at either the close of the prosecution's case or after the presentation of all the evidence. *Hoffman v. Lazaroff*, No. 18-3439, 2018 WL 5849894, at *2 (6th Cir. Sept. 17, 2018). Mr. Kocevar did not follow this rule because, while he made a motion to sever, he did not renew his objection at the close of the State's case. (*See* ECF #6-1 at PageID 472; *see also Kocevar*, 213 N.E.3d at 1248). Second, Ohio courts enforce the

contemporaneous-objection rule by analyzing a waived error under a plain-error standard of review. *See Murphy*, 747 N.E.2d at 789 (quoting Ohio Crim. R. 52(B)). The Second District did exactly that. (*See* ECF #6-1 at PageID 472; *see also Kocevar*, 213 N.E.3d at 1248). Third, the Sixth Circuit has repeatedly held Ohio's contemporaneous-objection rule is an independent and adequate state ground to foreclose review. *See Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017); *Hoffman*, 2018 WL 5849894, at *2 (applying rule to bar habeas review where motion to sever was not renewed).

Fourth, Mr. Kocevar does not advance cause for the procedural default. He may have been able to argue he had cause for the default because his counsel was ineffective for not renewing the objection, but that claim too is procedurally defaulted. An ineffective-assistance claim cannot serve as cause to excuse a procedural default when that claim is itself procedurally defaulted. *Murray*, 477 U.S. at 488-89. Mr. Kocevar procedurally defaulted any claim that his trial counsel was ineffective for not renewing the objection because he did not include that argument in his direct appeal despite extensively arguing the underlying issue. (*See* ECF #6-1 at PageID 390, 401-17). Mr. Kocevar cannot also argue his appellate counsel was ineffective for not preserving this particular attorney error because Mr. Kocevar procedurally defaulted that argument by not filing an application to reopen his direct appeal, the vehicle under Ohio law for raising such a claim. *See* Ohio App. R. 26(B). Thus, Mr. Kocevar does not show cause for why he did not follow the state procedural rule.

Thus, even if Ground Two were a cognizable habeas claim, all four factors support finding Mr. Kocevar procedurally defaulted Ground Two. I recommend the District Court **DISMISS** Ground Two.

**C.** **The Second District reasonably rejected Ground Three.**

In Ground Three, Mr. Kocevar argues the State unjustifiably delayed the indictment against him, prejudicing his defense because a witness to one of the events died before the indictment. (ECF #1 at PageID 8). The State argues the Second District's rejection of this claim on direct appeal is entitled to AEDPA deference and it was reasonable. (*See* ECF #6 at PageID 77-88).

The Second District decided Mr. Kocevar's pre-indictment-delay claim as follows:

{¶52} Kocevar's second assignment of error states that:

> The Trial Court Erred in Denying Kocevar's Motion to Dismiss by Finding that the State's Delay in Prosecution Was Justifiable, Resulting in Kocevar Suffering Prejudicial [*sic*], Thereby Warranting Reversal of the Convictions.

{¶53} Under this assignment of error, Kocevar contends that he established actual prejudice due to the State's delay in initiating prosecution on the charge involving K.K., and that the trial court incorrectly found that the State had provided justifiable reasons for the delay. In this regard, Kocevar states that K.K. and her mother told the Centerville Police Department in October 2014 about the alleged sexual assault, and that all sexual assault allegations concerning a minor warranted further action. Kocevar further contends that K.K.'s mother also informed her brother-in-law, who was a sheriff's deputy, about the sexual assault and that the incident was reported to the school principal. According to Kocevar, the officers and the principal were mandated reporters for sexual assault, their delay in disclosure further prejudiced him, and the State failed to establish justifiable reasons for failing to act until 2020, when the police investigated several complaints, including K.K.'s, against him.

{¶54} Before addressing Kocevar's arguments, we will outline the law that applies to preindictment delay and the review standard in such cases.

A. Preindictment Delay

{¶55} "The Sixth Amendment to the United States Constitution guarantees the accused in a criminal prosecution 'the right to a speedy and public trial.' But on its face, the Sixth Amendment provides no protection to those who have not yet been accused; it does not 'require the Government to discover, investigate, and accuse any person within any particular period of time.'" "Statutes of limitations provide the ultimate time limit within which the government must prosecute a defendant—a definite point 'beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.'" However, "when unjustifiable

preindictment delay causes actual prejudice to a defendant's right to a fair trial despite the state's initiation of prosecution within the statutorily defined limitations period, the Due Process Clause affords the defendant additional protection." This right arises under the Fifth Amendment to United States Constitution and Article I, Section 16, of the Ohio Constitution.

{¶56} The due process standard that Ohio applies in this situation involves actual prejudice and unjustifiable delay. The Supreme Court of Ohio has "firmly established a burden-shifting framework for analyzing a due-process claim based on preindictment delay. Once a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay."

{¶57} Determining "'actual prejudice' involves 'a delicate judgment based on the circumstances of each case.'" "In making this assessment, courts are to consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." "'Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." "The use of the word 'would' in the *Jones* decision is significant. It is not enough for a defendant to show that the missing evidence or unavailable testimony 'could' or 'may' help the defendant. Instead, the defendant must show that the evidence or testimony would help the defendant."

{¶58} "The death of a potential witness during the preindictment period can constitute prejudice, but only if the defendant can identify exculpatory evidence that was lost and show that the exculpatory evidence could not be obtained by other means."

{¶59} Concerning the justification for delay, "a delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant, * * * or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased." "The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable."

{¶60} "Ohio appellate courts have held that decisions on motions to dismiss for pre-indictment delay should be reviewed on the following basis: legal issues are reviewed de novo, but 'the court's findings of fact are afforded great deference.'"

{¶61} With these principles and standards in mind, we will consider Kocevar's arguments.

26

B. Decision on the Motion to Dismiss

{¶62} As noted, the trial court initially granted the motion to dismiss the charge involving K.K. based on actual prejudice to Kocevar. The court's decision was based on the death of Kocevar's father, Chad, who was in the apartment when Kocevar allegedly raped K.K. The court then reconsidered its decision and found that while actual prejudice occurred, the State had proved that the delay in bringing charges was justifiable. The court heard evidence about this issue during two separate sets of hearings.

{¶63} On December 21, 2020, the court heard testimony from the following witnesses: (1) Kathryn Gerspacher, a detective with CPD; and (2) Regina Kocevar, the defendant's mother. On March 12, 2021, the court heard testimony from Nadia Dexter, another CPD police officer. Then, on September 13, 2021, the court heard testimony from the following witnesses: (1) Jeffrey Kaercher, a CPD officer for 13 years; (2) R.K., the mother of K.K.; (3) Faupo Lauofo, a CPD officer for 24 years; and (4) Kathryn Gerspacher.

{¶64} As indicated, the trial court found that Kocevar had been prejudiced because he was unable to present evidence from his father, Chad, who had been present in the apartment at the time of K.K.'s alleged rape. Chad died in 2016, several years before the indictment was filed. In replying to Kocevar's assignment of error, the State has not challenged this finding. Instead, the State has focused on the issue of justifiable delay in bringing the indictment. We will do the same, beginning with the events pertaining to the 2014 police investigation. This is the information that was before the court when it made rulings on the motions to sever.

1. 2014 Investigation

{¶65} Concerning K.K., the allegation was that she had been at Kocevar's apartment (where he and his father, Chad, lived) on October 18, 2014. At that time, K.K. was in Kocevar's bedroom and he tried to kiss her. However, K.K. "pushed him off, told him no, and [told him] that she had a boyfriend." However, Kocevar "kept insisting until he was on top of her. When he got on top of her, he pulled her leggings down and then inserted his penis into her vagina after she repeatedly told him no." After Kocevar finished, he took a picture of K.K.'s breasts, and K.K. then left the apartment.

{¶66} K.K. immediately told her family about the rape and also discussed the incident with a friend, M.M. The night of the incident, K.K.'s mother, R.K., brought K.K. to CPD to file a police report. At the time, Officer Kaercher was on duty and took the report.

{¶67} According to Kaercher, R.K. reported that she had picked up K.K. at Bill's Donuts after K.K. had called to complain that she had been at Kocevar's apartment and that he had given her alcohol. In order to obtain a warrant, Kaercher would have

had to talk to K.K. and get direct information from her. During their discussion, Kaercher told R.K. that K.K. could potentially be charged with underage consumption if she had been drinking. After hearing this, R.K. said that she did not want Kaercher to talk directly to K.K. or to check any further. Kaercher did tell R.K. that he would go to Kocevar's apartment and see if underage drinking, in fact, had occurred.

{¶68} About 20 minutes later, Kaercher and CPD Officer Lauofo went to Kocevar's apartment and tried to make contact. However, most of the lights were off and no one appeared to be either awake or at home. Subsequently, around 5:30 a.m., Chad Kocevar called Kaercher and said that a neighbor had said the police had knocked at the door. When Kaercher explained that they had a complaint about underage drinking, Chad stated that he was not aware of any underage drinking. He also said that his son had gone to a football game with friends, had come home, and had watched a college football game with friends. Chad further said that he had gone to bed around 10:30 or 11:00 p.m.

{¶69} According to Officer Lauofo, his understanding was that he was accompanying Kaercher to the apartment to investigate an underage drinking party. During the investigation, Kaercher never mentioned anything to Lauofo about a sexual assault.

{¶70} According to Officer Kaercher, K.K.'s mother did not talk to him about a sexual assault. He said that if someone alleged a sexual assault, it would be documented in his report. However, no such allegation was in his report in this case. Kaercher further said that even if people say they want to tell the police something off the record, an information report can be made if someone just wants something to be documented. The police have cases where criminal complaints are reported but the victims do not want to proceed with anything.

{¶71} In addition, Officer Kaercher stated that he is a mandated reporter and that nothing in his October 2014 conversation with R.K. gave him any sense that his mandated reporter protocols should start. During this interview, Kaercher and K.K. also never exchanged any words with each other.

{¶72} R.K. testified that her daughter, K.K., had issues with depression and had been recently hospitalized for a suicide attempt at the time of the assault. As a result, R.K. was on top of K.K.'s activities; in fact, October 18, 2014, was the first night K.K. had been allowed out of the house. When R.K. picked up K.K. that evening, K.K. told her everything about the sexual assault and said they had some alcohol. R.K. decided to report the underage drinking but not to report the assault due to her husband's health problems and K.K.'s recent hospitalization.

{¶73} While talking with Officer Kaercher, R.K. asked a hypothetical question about what would happen if alcohol were involved and there was a sexual assault. R.K. did

28

not say who the victim was or that it was K.K., did not tell Kaercher where this hypothetical event took place, and did not provide any details.

{¶74} R.K. subsequently called her brother-in-law, who was a captain with the Montgomery County Sheriff's Department. She asked him whether, hypothetically, if someone were raped, would it be detrimental to the victim if it was a "he said/she said" situation. The brother-in-law did not know K.K. was involved, nor did R.K. give him any details about the event, she did not want to put him in a position to have to report it. During this conversation, R.K.'s brother-in-law just gave her an opinion. As recently as a week before the September 13, 2021 hearing, the brother-in-law was still unaware that K.K. had been sexually assaulted.

{¶75} In speaking with CPD Officer Nadia Dexter in 2020 (after the sexual assault was reported), R.K. stated that she thought she had told Officer Kaercher in October 2014 about the situation with K.K.'s mental health, and Kaercher said she could report the sexual assault whenever she was ready. Again, however, R.K. stressed that she spoke hypothetically with Kaercher and did not identify K.K. as the victim. At the time of the 2014 investigation, there were reports that underage drinking was common at Kocevar's apartment. The Centerville Police had received a number of callouts to the apartment, and the police and Alter High School administrators were aware of the prevalence of the underage drinking.

{¶76} Detective Gerspacher was the lead investigator when the sexual assault complaints were lodged in June 2020 with CPD. Gerspacher was not involved in the October 2014 investigation. According to Gerspacher, K.K. and her mother had discussed the sexual assault incident in October 2014 with Lourdes Lambert, who was then the principal at Alter High School. CPD Officer Dexter, who did many interviews in 2020, including with K.K. and R.K., said that R.K. asked Lambert not to let K.K. be in classes with Kocevar or have any contact with him. However, Lambert did not testify at any pretrial hearings or at any trials.

{¶77} On October 22, 2014, Kocevar's mother, Regina, received a phone call from Lambert, who asked her to find out what was happening. According to Lambert, some girls reported that a friend had said Kocevar forced himself on K.K. Lambert then asked K.K. to come into her office, but when K.K. first talked with Lambert, she said nothing had happened. Later, K.K. and her mother talked to Lambert; at this point, they said Kocevar had forced himself on K.K. in his bedroom and that his father, Chad, had been at the apartment when this took place.

{¶78} After speaking with Lambert, Regina Kocevar called her ex-husband, Chad, who said he had been home the entire time and that the alleged incident never happened. Chad's account was that he talked to K.K. briefly when she arrived; K.K. and Kocevar then went into Kocevar's room to visit. During this visit, the door was open and Chad sat in his usual spot in his wheelchair, where he had a line of sight

into the room. Chad also said that after the two teenagers left the bedroom, K.K. stayed for dinner and had pizza.

{¶79} After speaking with Chad, Regina called Lambert and told her what Chad had said. At that point, K.K.'s mother said she was not going to do anything about it because K.K. had issues. A vice-principal was listening in during this conversation. The school did not report the incident to the police. In addition, CPD did not have a school resource officer at Alter.

### 2. 2020 Investigation

{¶80} After that point, nothing ever came up again about sexual assault until the allegations were made against Kocevar in June 2020. CPD first became aware of the sexual assault allegations against Kocevar on June 9, 2020, when K.K. and R.O. (another alleged victim) came to CPD, made written statements, and brought in a written statement from M.M., a third alleged victim. CPD immediately began an investigation. CPD did not delay in investigating the case. While the case took a significant amount of time to investigate due to the number of victims and allegations, CPD did not delay in proceeding. In fact, the indictment was filed shortly thereafter, on June 24, 2020.

{¶81} After reviewing the record and giving due deference to the trial court's factual findings, we find no basis for reversing the court's judgment. There is no evidence that any delay was for purposes of gaining a tactical advantage over Kocevar, nor is there evidence that the State negligently ceased active investigation (or erred in judgment) and then later commenced action based on evidence it had available when it stopped actively investigating.

{¶82} In his brief, Kocevar relies heavily on R.C. 2151.421, which mandates that various individuals must report knowledge or suspicion of sexual abuse. According to Kocevar, CPD, R.K.'s brother-in-law, and Alter all had a duty to report suspected sexual abuse, and their failure to pursue it caused unjustifiable delay.

{¶83} R.C. 2151.421(A)(1)(a) states that:

> No person described in division (A)(1)(b) of this section who is acting in an official or professional capacity and knows, or has reasonable cause to suspect based on facts that would cause a reasonable person in a similar position to suspect, that a child under eighteen years of age, or a person under twenty-one years of age with a developmental disability or physical impairment, has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child shall fail to immediately report that knowledge or reasonable cause to suspect to the entity or persons specified in this division.

{¶84} The individuals described in R.C. 2151.421(A)(1)(b) include school personnel and peace officers (defined under R.C. 2151.421(O)(4) to include various law enforcement officers, including municipal officers). For violations of the duty to report, the statute provides for "compensatory and exemplary damages to the child who would have been the subject of the report that was not made." Persons who participate in making such reports are given general civil and criminal immunity, with some exceptions.

{¶85} In his brief, Kocevar fails to cite any authority on the applicability of R.C. 2151.412 other than some general case law indicating that peace officers are subject to the mandatory reporting requirements. That point is not in dispute here.

{¶86} There is no authority discussing failure to report child abuse in the specific context of whether it requires a finding of unjustifiable preindictment delay. The only two Ohio cases involving the terms "preindictment" and "R.C. 2151.421" discuss the statute in the context of whether a duty to report abuse might affect the tolling of a statute of limitations. *See State v. Jensen*, 6th Dist. Lucas No. L-20-1042, 2021-Ohio-3505, 2021 WL 4480888, ¶ 14 (statute of limitations did not begin to run due to mother's knowledge of sexual abuse and failure to report it; parents of victims were "specifically exempted by the state legislature from the reporting requirements under R.C. 2901.13(J)(2)"); *State v. Warren*, 168 Ohio App.3d 288, 2006-Ohio-4104, 859 N.E.2d 998, ¶ 14 (8th Dist.), citing *State v. Hensley*, 59 Ohio St.3d 136, 571 N.E.2d 711 (1991) ("When the victim of a sex offense is a child, the corpus delicti generally is deemed to be discovered when the child reaches the age of majority. * * * However, when the child tells a 'responsible person' who is required by law to report the events to a peace officer or children's services agency pursuant to R.C. 2151.421(A)(1), the statute of limitations begins to run as of that time, even if the child has not attained the age of majority.").

{¶87} *Jensen* involved a 25-year delay, and the delay in *Warren* was 16 years. In both cases, a six-year statute of limitations applied at the time of the offenses but was later increased. However, since the victims were below the age of majority when the amendment took effect, the original statute did not apply, and the criminal actions were timely brought under the increased limitations period.

{¶88} The defendant in *Jensen* did raise the issue of preindictment delay, claiming that the police had intentionally delayed the indictment. This was not related to the reporting issue because there was no discussion in the case about the police having prior knowledge of the alleged sexual abuse. The court also did not dwell on preindictment delay because the defendant's guilty pleas waived this claim.

{¶89} In the case before us, there was no issue about whether the statute of limitations had expired. In October 2014, K.K. was 16 years old and was under the age of majority. At that point, the applicable statute of limitations was 20 years. In July 2015, the limitations period for rape was increased to 25 years. This was before K.K.

reached the age of majority in January 2016 and the new 25-year statute applied. Nonetheless, under either statute of limitations, the indictment was timely filed. That occurred in June 2020, which was a bit more than six years after the alleged crime. Thus, *Jensen* and *Warren* are irrelevant to the issue before us.

{¶90} We do note that in *Warren*, the court remarked (not in the context of R.C. 2151.421) that "[t]he victim did not report the crime to the police until April 2004. Her delay in reporting the crime cannot be ascribed to the state for purposes of finding a violation of appellant's due process rights." That is the situation here. The police cannot be faulted for failing to investigate crimes victims choose not to report. Moreover, as noted, R.K.'s brother-in-law was not even aware that K.K. was a victim.

{¶91} It is true that "R.C. 2151.421 provides an appropriate list of responsible adults who, upon obtaining knowledge of possible child abuse, are charged by operation of law with reporting said abuse to the proper authorities." Here, the alleged sexual abuse was apparently reported to the Alter administration, but its failure to act should not be imputed to the State for purposes of preindictment delay. The United States Supreme Court has said in a related context that "mandatory child abuse reporting statutes 'alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution' for purposes of the Confrontation Clause."

{¶92} In *Jackson*, the court went on to hold that "a social worker's statutory duty to cooperate and share information with law enforcement with respect to a child abuse investigation does not render the social worker an agent of law enforcement for purposes of the Fifth and Sixth Amendments to the United States Constitution when the social worker interviews an alleged perpetrator unless other evidence demonstrates that the social worker acted at the direction or under the control of law enforcement." The court found no evidence in *Jackson* that the social worker was acting as a law enforcement agent.

{¶93} For purposes of its analysis, the court stressed that "'[w]hether someone is acting as an agent of law enforcement is dependent upon the unique circumstances of each case.'" As in *Jackson*, no evidence was presented that Alter was acting as CPD's agent or as an agent of the State. Accordingly, even if R.C. 2151.421 applied, there would be no basis for holding that any delay in initiating prosecution against Kocevar was unjustified.

{¶94} Based on the preceding discussion, the second assignment of error has no merit and is overruled.

(ECF #6-1 at PageID 486-99; *see also Kocevar*, 213 N.E.3d at 1255-61) (citations omitted).

32

As noted earlier, Mr. Kocevar must show the Second District's adjudication of his pre-indictment-delay claim was contrary to Supreme Court precedent or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

The Second District's decision was not contrary to clearly established federal law and did not unreasonably apply that law. The Second District cited the governing Supreme Court precedent, *United States v. Marion*, 404 U.S. 307 (1971), and noted the Due Process clause protects against unjustified pre-indictment delay if it deprives the person of the right to a fair trial by causing actual prejudice. (ECF #6-1 at PageID 486; *see also Kocevar*, 213 N.E.3d at 1255). While the Second District focused on Ohio's constitutional protection, Ohio's law on preindictment delay is broadly consistent with clearly established federal law. *See United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992) (holding under federal law, "dismissal for pre-indictment delay is warranted only when the defendant shows (1) substantial prejudice to his right to a fair trial and (2) that the delay was an intentional device by the government to gain a tactical advantage").

The Second District's analysis focused on the second part of the federal standard, whether the delay was intended by the State to gain a tactical advantage. It is well-established under federal law that a delay resulting from investigative efforts "does not deprive [a petitioner] of due process, even if his defense may have been somewhat prejudiced by the lapse of time." *United States v. Atisha*, 804 F.2d 920, 928 (6th Cir. 1986) (citations omitted). As the Second District noted, there was an inconclusive investigation into the sexual assault on K.K. in 2014 and then a six-year break until K.K. and another victim came forward in 2020. (ECF #6-1 at PageID 494; *see also Kocevar*, 213 N.E.3d at 1259). The State then indicted Mr. Kocevar within a month of the victims coming forward. (*Id.*). The State also prosecuted him within the applicable statute of limitations (*see* ECF

33

#6-1 at PageID 497; *see also Kocevar*, 213 N.E.3d at 1260-61), and under federal law, those statutes "provide the primary protection against [pre-indictment] delay." *Betterman v. Montana*, 578 U.S. 437, 441 (2016).

Moreover, the Supreme Court has not considered the death of a witness as inherently prejudicial. *See United States v. Lovasco*, 431 U.S. 783 (1977) (finding insufficient prejudice to the defendant from death of two witnesses during 18-month delay). Despite his death, the jury still heard testimony that Mr. Kocevar's father was watching TV in the next room in 2014 when A.H. was sexually assaulted. (*See* ECF #6-2 at PageID 1010, 1327, 1329-30, 1333, 1527). Defense counsel was able to use this fact during closing argument to argue the encounter was consensual. (*Id.* at PageID 1610-12, 1625-26). Thus, other witnesses' testimony at least partially mitigated the prejudice to Mr. Kocevar's defense from his father's death. Because of the delay in the investigation, the speed of the indictment in 2020, and the mitigated prejudice, it was thus not unreasonable for the state court to conclude the 2016 passing of Mr. Kocevar's father was not enough to cause prejudicial delay.

I thus recommend the District Court **DENY** Ground Three as without merit.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a COA and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2). When a district court has determined a petitioner's constitutional claim to lack merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving

34

a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not needed to grant a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Kocevar has not made a substantial showing that he was denied any federal constitutional right. Jurists of reason would not find it debatable whether the grounds for relief are meritorious federal constitutional claims. I thus recommend the District Court **DENY** Mr. Kocevar a COA for all grounds of his petition.

### CONCLUSION AND RECOMMENDATION

For these reasons, I recommend the District Court **DENY** Grounds One and Three on the merits, **DISMISS** Ground Two as not cognizable, and **DISMISS** the petition. I further recommend the District Court **DENY** Mr. Kocevar a certificate of appealability on all grounds.

Dated: June 2, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

<u>Objections, Review, and Appeal</u>

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).